HORACE MANN INSURANCE COMPANY, Plaintiff-Appellee, v. SHIRLENE WILLIAMS *et al.*, Defendants-Appellants.

First District (1st Division)    No. 1—01—0963

Opinion filed May 6, 2002.—Rehearing denied June 4, 2002.

Edmund J. Scanlan, of Law Offices of Edmund J. Scanlan, Ltd., of Chicago, for appellants.

Donald Segal and Andrea Bloomberg Cohan, both of Segal, McCambridge, Singer & Mahoney, Ltd., of Chicago, for appellee.

JUSTICE COUSINS delivered the opinion of the court:

On January 22, 1999, Horace Mann Insurance Company (Horace Mann) filed a declaratory judgment action seeking a declaration that Horace Mann had no obligation to submit to arbitration or to provide insurance coverage under its policy to Marion Williams, Erica Williams (deceased), and Eugene Williams, asserting that they were not insured under the policy issued to Shirlene Williams.

The parties filed cross-motions for summary judgment. The trial court granted Horace Mann's motion for summary judgment and denied the Williamses' cross-motion. The Williamses filed a motion for reconsideration. The motion was denied. Shirlene Williams, Marion Williams, as administratrix of the estate of Erica Williams, and Eugene Williams appeal the trial court's order granting summary judgment and present the following issues on appeal: (1) whether the trial court erred as a matter of law in granting Horace Mann's motion for summary judgment and in denying defendants' motion for reconsideration; (2) whether the term "lives with," as it is used in the policy of insurance, is ambiguous and should be strictly construed against the insurer and in favor of the covered; and (3) whether, after viewing the evidence in the light most favorable to the defendants, there is ample evidence in the record to support the fact that Marion, Erica, and Eugene Williams lived with the named insured, Shirlene Williams.

## BACKGROUND

Marion Williams and Shirlene Williams have lived in a building on Constance Avenue in Chicago, Illinois, since August or September 1984. The building was originally built as a two-flat. The building has a first-floor apartment and a second-floor apartment. Each apartment has a separate kitchen with a refrigerator, a dining room, and three bedrooms.

Shirlene Williams, her mother, Rachel Williams, her daughter, Allison, and her sister, Marion Williams, and Marion's two children, Erica and Eugene Williams, resided in the building. Also residing in the building was Charles Wright. Wright is Erica and Eugene's father and Marion's live-in boyfriend.

On December 28, 1988, Horace Mann issued an automobile policy to Shirlene Williams. On May 29, 1989, Erica and Eugene Williams were passengers in a vehicle driven by Charles Wright which collided with another vehicle. Eugene suffered injuries and Erica suffered fatal injuries as a result of the accident. Shirlene Williams' policy was in effect at the time of the accident.

On November 6, 1998, attorney Edward Scanlon sent a letter to Horace Mann on behalf of Marion Williams, as administratrix of the estate of Erica Williams, and Eugene Williams, requesting coverage under the uninsured and underinsured motorist provisions of the policy issued to Shirlene Williams. Marion Williams demanded $200,000 in the settlement of her claim, $100,000 representing the policy limit for uninsured motorist coverage and $100,000 for underinsured motorist coverage. Eugene Williams demanded $30,000 under the uninsured motorist coverage and $30,000 for underinsured motorist coverage. The Williamses further sought arbitration.

On December 2, 1998, Horace Mann advised attorney Scanlon that there existed questions of coverage under the policy and the Williamses' request for arbitration was denied until the questions of coverage were resolved by a court of law.

The policy at issue here provides:

> "Who is an insured?
> When we refer to your car, a newly acquired car or a temporary substitute car insured means:
> 1. you;
> 2. your *relatives* \*\*\*." (Emphasis omitted and added.)

A "relative" is defined by the policy as "a person related to you by blood, marriage or adoption who *lives with you*." (Emphasis added.)

Horace Mann filed a complaint for declaratory judgment on January 22, 1999, asserting that Marion Williams did not have any rights under the policy of insurance issued to Shirlene Williams and Horace Mann had no duty to submit to arbitration with the Williamses.

The Williamses answered the complaint, requesting the court to order Horace Mann to arbitrate the claims, to declare that Horace Mann had an obligation to Marion, Erica, and Eugene Williams under the policy, and to declare that Marion, Erica, and Eugene Williams were insured under the policy with Horace Mann. The Williamses reasoned that Marion, Erica, and Eugene Williams were all living with Shirlene Williams on December 28, 1988, and May 29, 1989, and, accordingly, were insured under the terms and conditions of the policy.

Marion Williams stated during deposition that the two interior doors in the foyer of the two-flat building were "[n]ever ever locked." She stated that the keys used to lock and unlock the interior doors were not the same keys used on the main entrance. The upstairs apartment had one kitchen, one living room, one dining room, and one bathroom. The downstairs apartment also had one kitchen, one living room, one dining room, and one bathroom. Additionally, there was a kitchen area and bathroom in the basement. The building contained one washer and one dryer located in the basement that everyone used. Marion Williams testified that her mother, Rachel Williams, cooked for everyone in the house in the downstairs kitchen and they ate their meals downstairs, as well.

Marion stated that there were three separate phone lines in the building and all three were used by all members of the house. Marion explained that she primarily used one particular phone line because the other phone line was the line that her sister, Shirlene, used to "operate her TDD." The phone line that Marion used rang only upstairs. The other two numbers at the address rang downstairs.

Marion Williams testified that the "gas bill comes for the whole house," the electric bills come separately and each comes addressed to Shirlene Williams, and she pays half of the electric bill. Marion stated that tax bills and mortgage bills were in both her name and Shirlene's name.

Marion was asked the following during deposition:

"Q. Now, your daughter Erica Williams and your niece Allison Jenkins are actually biologically first cousins, correct?

A. That is correct.

Q. How did they consider themselves, though, while they lived together in your home at 7824 South Constance.

A. As sisters.

Q. Did they share a bedroom together?

A. Yes, they did.

Q. Where was that bedroom located?

A. On the first floor.

Q. From time to time, would they also come upstairs, the two of them, that being Allison Jenkins and your deceased daughter Erica Williams, did they come up to the second floor from time to time?

A. Yes. Yes, they did.

Q. To sleep I mean?

A. Yes, yes. To sleep, yes.

Q. Were the arrangements with respect to where a person slept on a particular night kind of open inasmuch as there were six bedrooms in the building itself?

A. You're right. Wherever you could pick a spot, if there wasn't noise, or if you could beat that person there first, yes, yes."

Marion also stated that her bedroom was upstairs.

At deposition, Charles Wright stated that he has lived in the home on Constance Avenue since 1984. Marion Williams, Shirlene Williams, Marion and Shirlene's mother, Rachel Williams, Allison Jenkins, and Wright's two children, Erica and Eugene Williams, also lived there. He testified that Allison lived both upstairs and downstairs. Wright explained that "[i]t was like a big house." He stated that there were two apartments in the house, one upstairs and one downstairs.

Wright further stated that the two interior doors had locks on them, but the doors were open all of the time. Wright testified that he used only one phone number and that phone number rang on the second floor. He stated that there was another phone line that rang on the first floor, but neither of the phone numbers rang on both floors. His phone number was placed in Shirlene Williams' name. Wright stated that he did not pay his phone bill and payment was worked out between Shirlene and Marion. When Wright received mail at the home, it was not addressed to the second floor, just to the street address. Counsel asked Wright, "Do you know whose name the other phone line is in?" He responded, "Shirlene, if I'm not mistaken."

The following colloquy also occurred during deposition:

"Q. Did you pay the—do you know how many ComEd bills were received per month at 7824 South Constance?

A. I know one because I know one was for me. But I guess they got one of their own. I know I got one.

Q. When you say 'one of their own,' what do you mean by that?

A. I guess for Shirlene.

Q. So was one ComEd bill for upstairs?

A. Well, for me, yeah, for upstairs, yeah.

Q. Was that in your name?

A. Yes.

Q. And Shirlene received a separate ComEd bill for downstairs?

A. Yeah, I guess so."

Wright testified that each of the kitchens in the home had its own major appliances, such as a stove, sink and refrigerator. Wright was further asked:

"Q. In May of 1989 when you ate meals at your home, with whom did you eat?

A. It's hard to say. Most times I would come in and it would be late at night they [*sic*] eating dinner. So most times I would be upstairs, second floor, by myself. ***

Q. When you were eating your meals with others, who cooked these meals?

A. Well, I guess Shirlene would cook some, Ms. Williams, Racheal [*sic*], would cook some, or Marion. Everybody just, you know, would chip in and help.

Q. Where were these meals cooked?

A. Sometimes upstairs, sometimes downstairs. Wherever they happened to be gathering at the moment."

Wright also testified that his daughter, Erica, would frequently sleep downstairs, in the same bedroom with Allison. His daughter, Erica, did not have her own bedroom or bed upstairs. Wright slept upstairs with his girlfriend, Marion. When Erica slept upstairs, she would sleep in the same bed as Wright and Marion.

The following colloquy is taken from Shirlene Williams' deposition:

"Q. Who sleeps on the first floor?

A. Me, my *mother*, my *daughter*, and Erica did stay there.

Q. And as of the date of the accident in May 1989, who slept on the second floor?

A. Marion, Eugene, and Erica.

Q. Is that all?

A. Yes.

Q. And at the time of the accident, who did you eat your meals with?

A. All of us ate together."

On June 19, 2000, Horace Mann filed a motion for summary judgment. Horace Mann maintained that Marion, Erica, and Eugene Williams were not insureds under the policy because none was a relative that lived with Shirlene Williams, and, therefore, Marion Williams, as administratrix of the estate of Erica Williams, did not have any rights under the insurance policy issued to Shirlene Williams.

On August 15, 2000, the Williamses filed a cross-motion for summary judgment. On October 6, 2000, the trial court entered an order granting summary judgment to Horace Mann and denying the Williamses' cross-motion for summary judgment. The court denied the Williamses' subsequent motion for reconsideration.

## ANALYSIS

■ Appellate courts apply a *de novo* standard when reviewing summary judgment rulings. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992). Where there are no genuine issues of material fact, summary judgment is a proper method of disposing of a cause. *Smith v. Allstate Insurance Co.*,

312 Ill. App. 3d 246, 251, 726 N.E.2d 1 (1999). Summary judgment is appropriate only when the pleadings, depositions, admissions, and affidavits on file, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Smith*, 312 Ill. App. 3d at 251.

Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied. *Pyne v. Witmer*, 129 Ill. 2d 351, 358-59, 544 N.E.2d 1304 (1989). To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage, but must present some factual basis that would support his claim. *Taliaferro v. One Grand Place Venture*, 256 Ill. App. 3d 429, 432, 628 N.E.2d 815 (1993).

I

The Williamses assert that the trial court erred in its entry of summary judgment in favor of Horace Mann. They maintain that genuine issues of material fact remain as to whether Marion, Eugene, and Erica Williams were living with Shirlene Williams on May 29, 1989. Horace Mann responds that the facts demonstrate that neither Marion, Erica nor Eugene Williams was living with Shirlene Williams at the time of the accident, and, thus, they are not entitled to coverage under Shirlene Williams' insurance policy.

The policy at issue here defines "relative" as "a person related to you by blood, marriage or adoption who *lives with you*." (Emphasis added.) This definition has two prongs that must be met in order for coverage to apply. The first prong is that the claimant must be related to the insured by "blood, marriage or adoption." Marion, as Shirlene's sister, and Erica and Eugene, as Marion's children, satisfy the first prong in that they are related to Shirlene Williams by blood. However, they must also prove the second prong, which requires that the claimant must live with the insured.

As the nonmoving party, the Williamses must present some factual basis that would support their claim that either Marion, Erica, or Eugene was a relative that lived with Shirlene Williams at the time of the accident in accordance with the meaning and intent of the parties to the insurance contract. See *Taliaferro*, 256 Ill. App. 3d at 432. The Williamses assert that the evidence offered by Horace Mann was insufficient to foreclose all genuine issues of material fact and contend that the fact that the building was originally constructed as a two-flat has no probative value as to how the families lived within it. We disagree.

■ The record in the instant case establishes that Marion and Shirlene Williams divided the payments for the mortgage, building taxes, gas bill, and electrical bills of the two-flat building that they

purchased as joint tenants in 1984. The foyer of the home contained two doors, one of which led to the upstairs apartment and the other to the first-floor apartment. While it is true that Marion and Shirlene are sisters, that Marion's daughter, Erica, and Shirlene's daughter, Allison, regarded themselves as sisters, and that the persons living in the building ate most of their meals together, the building contained separate apartments, each with a separate kitchen, dining room, and three bedrooms. The living arrangement of the families establishes that Shirlene Williams' family and Marion Williams' family were two related families living in separate apartments. Marion Williams and Charles Wright and their family lived in the upstairs apartment and Shirlene Williams, Shirlene and Marion's mother, Rachel Williams, and Shirlene's daughter, Allison, lived in the downstairs apartment. The fact that they have had access to each other's apartments and ate meals together does not create the "lives with" aspect of coverage eligibility.

Although Marion and her children and Shirlene are relatives, the facts, considered in the light most favorable to the defendants, do not support the contention that Marion Williams, Erica Williams, and Eugene Williams were relatives that lived with the insured, Shirlene Williams, at the time of the accident, as intended by the insurance policy issued by Horace Mann. Accordingly, the trial court did not err in granting summary judgment in favor of Horace Mann.

## II

The Williamses also contend that the term "lives with," as used in the insurance policy, is ambiguous and requires interpretation in favor of coverage. Horace Mann responds that the language as set forth in the policy is unambiguous. We agree.

In construing insurance policies, the court's primary purpose is to determine and to give effect to the intention of the parties, as expressed in the agreement. *Outboard Marine,* 154 Ill. 2d at 108. All parts of an insurance contract are to be considered together in order to ascertain the meaning and intent of the parties. *Grevas v. United States Fidelity & Guaranty Co.,* 152 Ill. 2d 407, 410, 604 N.E.2d 942 (1992).

■ A policy provision is ambiguous only if it is subject to more than one reasonable interpretation. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.,* 144 Ill. 2d 64, 74, 578 N.E.2d 926 (1991). If the language of an insurance policy is ambiguous, it must be construed against the insurance company and in favor of the insured. *Allstate Insurance Co. v. Gonzalez-Loya,* 226 Ill. App. 3d 446, 449, 589 N.E.2d 882 (1992). However, if a policy of insurance is clear and unambiguous, it must be enforced according to its terms. *Allstate,* 226 Ill. App. 3d at 449.

■ The policy at issue here defines "relative" as "a person related to you by blood, marriage or adoption who *lives with you.* It includes your unmarried and dependent child who is away at school." (Emphasis added.) In the Williamses' view, the term "lives with" is susceptible to more than one reasonable interpretation and is therefore ambiguous.

Horace Mann cites *State Farm Mutual Automobile Insurance Co. v. Taussig,* 227 Ill. App. 3d 913, 592 N.E.2d 332 (1992). In *Taussig,* State Farm sought a declaratory judgment that it owed no duty to defend or indemnify defendant, Mark Taussig, against certain claims arising out of an automobile accident. *Taussig,* 227 Ill. App. 3d at 914. State Farm issued an automobile liability insurance policy to Taussig's father. The policy provided coverage to the insured and his or her "relative." A "relative" was defined as a person related to the insured by blood, marriage or adoption who lived with the insured. *Taussig,* 227 Ill. App. 3d at 915. In December 1987, defendant moved from his parents' home in Highland Park to an apartment in Evanston. Defendant was employed full time and ate most of his meals at the apartment. Defendant returned to Highland Park three or four times during the first month after moving to Evanston. Defendant stated that he considered the Evanston apartment a temporary living situation and that his permanent address was in Highland Park. The court held that no ambiguity existed in the policy definition of "relative" and was unpersuaded by defendant's argument that because he still had a room in his parents' home and left some of his personal belongings there and continued to use the mailing address, he was still living with them. *Taussig,* 227 Ill. App. 3d at 916. Moreover, the court wrote: "the fact that defendant continued to use the mailing address and occasionally visited his parents is not sufficient to meet the 'living with' standard for purposes of this insurance policy." *Taussig,* 227 Ill. App. 3d at 916.

In our view, *Taussig* is not dispositive of the issue before us because no contention was made in *Taussig* that an ambiguity existed in the term "lives with." We hold that the term "lives with" as used in the policy issued by Horace Mann in the instant case is not ambiguous. Whether or not a relative lives with an insured is a factual determination and is resolved according to the particular facts of a case. Our review of the depositions and exhibits before the trial court establishes that Marion Williams and her children are related to Shirlene Williams, but they are not related persons *living with* the insured for purposes of coverage. Accordingly, we affirm the trial court's grant of summary judgment in favor of Horace Mann.

Affirmed.

COHEN, P.J., and McNULTY, J., concur.